COMMITTEE ON PROFESSIONAL ETHICS AND CONDUCT OF THE IOWA STATE BAR ASSOCIATION, Complainant,

v.

Stanford J. PATTERSON, Respondent.

No. 84-1102.

Supreme Court of Iowa.

June 19, 1985.

Frank A. Comito, Jr., and Patrick W. O'Bryan of Comito & Capps, Des Moines, for complainant.

Thomas W. Langlas of Gallagher, Langlas & Gallagher, P.C., Waterloo, for respondent.

REYNOLDSON, Chief Justice.

This is a disciplinary proceeding against an attorney, based on a serious misdemeanor conviction, "assault without intent to inflict serious injury but causing bodily injury contrary to ... section 708.2(2) of the Iowa Code." Although respondent Stanford J. Patterson entered an *"Alford"*-type guilty plea to this offense in Black Hawk County, there is little dispute concerning the circumstances surrounding the incident.

Respondent is a forty-nine-year-old solo practitioner in Waterloo. In the fall of 1983 he met Debra Herman, age twenty-nine, when they both enrolled in a concealed weapons class at Hawkeye Institute of Technology in Waterloo. Debra was estranged from her husband; respondent and his wife recently had concluded a bitter dissolution proceeding. Respondent and Debra soon became romantically involved. When she decided to file for marital dissolution, respondent agreed to represent her and filed the action in her behalf.

On the evening of January 31, 1984, Debra had a dinner date with her husband to discuss ways of communicating about Jason, their four-year-old son who lived with Debra. The latter, apparently concerned about respondent's reaction, told him she would be with a girl friend. After dinner Debra picked up Jason at her mother's home and returned to her own house.

Respondent, using a key Debra had provided and following an established custom, was already in the home and waiting in Debra's bedroom when she put Jason to bed. When she entered the bedroom at about 10 p.m. respondent asked Debra where she had been, although he already had called her girl friend and found Debra was not with her. When Debra told respondent that she had been with her husband, he immediately began striking her and tore off her clothes. This abuse lasted approximately two hours. Jason, aroused, attempted to enter his mother's bedroom but respondent had locked the door. He ordered Debra to tell Jason to go back to bed. Jason then attempted to call his father or the police from the kitchen telephone, but the telephone in Debra's room was off the hook. Photographs of Debra taken the following day show a badly disfigured and battered woman, a dramatic testimonial to respondent's eighteen-month instruction in the martial arts.

At about 1 a.m. respondent began to apply cold compresses to minimize Debra's swelling and bruises, and carried her to the bathroom because she could not walk as a result of the beating. Respondent and Debra testified he offered to take her from the community until she recovered, and at another time offered to take her to the hospital. He stayed throughout the night, occasionally checking Debra's pulse and temperature. Respondent consistently has denied any recollection of his actions during the two-hour incident.

In the morning when Jason's sitter came to pick him up, Debra accompanied him from the house and then left in her own car, wearing only a coat over her pajamas and a towel around her head. She went to her mother's home. The latter insisted Debra go to the hospital, and, apparently without Debra's knowledge, called the police. At the hospital the police interviewed and photographed Debra. Debra testified she had never told her family of her relationship with respondent, but later she did tell the police.

Meanwhile, respondent left the state and drove to Mayo Clinic, Rochester, Minnesota, where it appears he was examined or treated by a psychiatrist for three days on an outpatient basis. He took from Waterloo the clothing he had torn off Debra and destroyed it there. The day following the incident, after Debra returned home,

respondent called her several times from Minnesota, wanting "to talk." Debra testified she had a telephone conversation with respondent on February 2, at which time she reported she was "being hounded by the police" for a written statement. Respondent provided her with the names of two lawyers, one of whom she retained.

Subsequently Debra refused to answer questions at a county attorney's examination, and was confined briefly to jail for contempt. At the same time the court appointed other counsel who persuaded her to respond to the questions.

Trial information was filed against respondent February 8, 1984. Respondent and Debra were married March 8, 1984. June 8, 1984, he entered his guilty plea to the charges. Thereafter Debra initiated dissolution proceedings against respondent. The decree was entered November 19, 1984, shortly before the November 29 hearing in this proceeding.

The complaint filed by the Committee on Professional Ethics and Conduct of the Iowa State Bar Association, alleged

> [t]hat the acts and conduct of Respondent in violation of the Criminal Code of the State of Iowa, and the aforesaid conviction itself, constitute violations of the following
>
> (a) Section[s] 602.10122(3) and 602.10122(4) of the Iowa Code;
> (b) EC 1–5;
> (c) DR 1–102(A)(1), (5) and (6);
> (d) EC 9–1;
> (e) EC 9–2; and
> (f) EC 9–6 of the Iowa Code of Professional Responsibility for Lawyers.

The Grievance Commission (commission) found a violation of EC 1–5 only, and recommended a reprimand. We suspend respondent's license to practice law indefinitely with no possibility of reinstatement for three months.

I. The principles we apply in these proceedings were reviewed recently in *Committee on Professional Ethics and Conduct v. Shuminsky*, 359 N.W.2d 442, 444–45 (Iowa 1984):

> We review the record made before the commission de novo. We give respectful consideration to the commission's findings and recommendations although they are not binding on us. If we find the complainant has established the charges by a convincing preponderance of the evidence, we impose an appropriate sanction, considering not only the respondent's fitness to practice law, but the need to deter others from similar conduct and assure the public that courts will uphold the ethics of the legal profession. Complainant need not prove respondent was acting as a lawyer at the time of the alleged misconduct; lawyers do not shed their professional responsibility in their personal lives.

(Citations omitted.)

Iowa Code section 602.10122(3) provides that the license of an attorney may be suspended or revoked upon the ground he or she has committed "[a] willful violation of any of the duties of an attorney ... as hereinbefore prescribed." One of those duties is "[n]ot to encourage either the commencement or continuance of an action or proceeding from any motive of passion or interest." Iowa Code § 602.10112(6). We are not required here to determine whether this attorney who assaulted his dissolution action client because she went to dinner with her husband encouraged the continuance of the action from a motive of passion. Adequate ground for the discipline we impose exists within the Code of Professional Responsibility for Lawyers.

In Iowa the ethical considerations do more than illuminate the disciplinary rules; in this jurisdiction a violation of an ethical consideration alone is sufficient to support discipline. *Shuminsky*, 359 N.W.2d at 445; *Committee on Professional Ethics and Conduct v. Millen*, 357 N.W.2d 313, 314–15 (Iowa 1984).

EC 1–5 provides:

> A lawyer ... should refrain from all illegal and morally reprehensible conduct. Because of his position in society, even minor violations of law by a lawyer may tend to lessen public confidence in

the legal profession. Obedience to law exemplifies respect for law. To lawyers especially, respect for the law should be more than a platitude.

A portion of the above concept finds a place in EC 9–6:

Every lawyer owes a solemn duty ... to encourage respect for the law....

Paraphrasing what we wrote in *Committee on Professional Ethics and Conduct v. Bromwell,* 221 N.W.2d 777, 779 (Iowa 1974), when those licensed to operate the law's machinery knowingly violate essential criminal statutes, there inexorably follows an intensified loss of lay persons' respect for the law.

II. We find respondent's two-hour assault on an unresisting female constitutes a violation of EC 1–5 and EC 9–6. Based on the duration of the beating, respondent's intermittent "discussions" with Debra, coupled with his demands she divert her interceding son, we are convinced that respondent was fully conscious of what he was doing. There is little beyond his own contentions, and no professional opinion, to support respondent's claim that he lost his reason and has no recollection of the event. He stands convicted of a serious misdemeanor.

In our view, respondent's conduct is fully as morally reprehensible as accepting gifts in violation of a federal statute limiting attorney fees, *Committee on Professional Ethics and Conduct v. Christoffers,* 348 N.W.2d 227, 229–30 (Iowa 1984); having possession of marijuana and amphetamines, *Shuminsky,* 359 N.W.2d at 445; or making obscene telephone calls, *Committee on Professional Ethics and Conduct v. Floy,* 334 N.W.2d 739, 740 (Iowa 1983). *See Committee on Professional Ethics and Conduct v. Wilson,* 270 N.W.2d 613, 615 (Iowa 1978).

Nor, in the circumstances of this case, can we agree with the commission's finding that respondent's conduct did not involve moral turpitude.

The term "moral turpitude" has been used in the law for centuries. It has been the subject of many decisions by the courts but has never been clearly defined because of the nature of the term. Perhaps the best general definition of the term "moral turpitude" is that it imports an act of baseness, vileness or depravity in the duties which one person owes to another or to society in general, which is contrary to the usual, accepted and customary rule of right and duty which a person should follow.

*Committee on Legal Ethics v. Scherr,* 149 W.Va. 721, 726–27, 143 S.E.2d 141, 145 (1965). Respondent's conduct, under the facts disclosed by this record and modern day social mores, clearly met the above definition.

It is ordered that respondent's license to practice law should be suspended indefinitely with no possibility of reinstatement for three months. This suspension shall apply to all facets of the practice of law. *See* Iowa Sup.Ct.R. 118.12. Upon application for reinstatement, respondent shall have the burden to prove that he has not practiced law during the period of suspension and that he meets the requirements of supreme court rule 118.13.

LICENSE SUSPENDED.