# IN THE SUPREME COURT OF IOWA

No. 15–1917

Filed February 26, 2016

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Complainant,

vs.

**JAMIE F. DEREMIAH,**

Respondent.

On review of the report of the Grievance Commission of the Supreme Court of Iowa.

Grievance commission recommended thirty-day suspension of attorney's license. **LICENSE SUSPENDED.**

Tara J. Van Brederode and Susan A. Wendel, Des Moines, for complainant.

F. Montgomery Brown of F.M. Brown Law Firm, P.L.L.C., West Des Moines, for respondent.

**APPEL, Justice.**

In this disciplinary case, the Iowa Supreme Court Attorney Disciplinary Board charged the respondent, Jamie F. Deremiah, with violations of Iowa Rule of Professional Conduct 32:8.4(b) (stating it is professional misconduct to "commit a criminal act that reflects adversely on a lawyer's honesty, trustworthiness, or fitness as a lawyer") in connection with a domestic assault on Jane Doe. After a hearing, the majority of the Grievance Commission of the Supreme Court of Iowa (commission) recommended a thirty-day suspension of the respondent's license; a two-year probationary period, with conditions related to maintaining his sobriety; and medical documentation showing his compliance with treatment providers' recommendations. One member of the commission dissented on the sanction, recommending instead a ninety-day suspension. A second commission member also dissented on the sanction but recommended a public reprimand.

For the reasons expressed below, we conclude that the respondent violated Iowa Rule of Professional Conduct 32:8.4(b). We suspend the respondent's license to practice law indefinitely with no possibility of reinstatement for three months and impose conditions upon any application for reinstatement.

### I. Factual and Procedural Background.

**A. Factual Findings.** Most of the facts are not disputed. Witnesses at the hearing before the commission included police officers and a county attorney with knowledge related to the underlying criminal case, persons engaged in Deremiah's treatment for alcoholism, and Deremiah himself. Based on our review of the entire record, we make the following findings of fact.

Deremiah began drinking alcohol at an early age and had a number of alcohol-related incidents prior to becoming a lawyer. Specifically, he had "two or three" citations for possession of alcohol and one incident of operating a motor vehicle while under the influence (OWI) while attending college but prior to attending law school. He had no involvement with the criminal justice system for alcohol-related offenses until the recent events described in this opinion.

Deremiah graduated from law school in 2008 and is licensed to practice law in Iowa. He practiced in a number of professional settings for relatively short periods of time. One firm terminated Deremiah for what he described as alcohol-related absences.

Deremiah is currently employed as "of counsel" with a Des Moines metropolitan area law office. He practices primarily in the areas of criminal and family law. Under his arrangement with the law office, he retains fifty percent of his billings collected from clients.

Deremiah and Doe knew each other in high school but began dating only after meeting at a bar several years ago. During the course of their relationship, they maintained separate residences, but they usually slept together in the evening. Doe gave Deremiah a set of keys to her home, where she lived with her ten-year-old daughter.

The relationship, however, was marked by jealousy and allegations of infidelity. In April 2014, Des Moines police responded to a domestic incident at Doe's home. The facts of this incident were not thoroughly developed at the hearing, but police were apparently called to Doe's home after a jealous and intoxicated Deremiah burned some of Doe's DVDs and refused to leave the residence. Police who arrived at the scene called a cab to transport Deremiah home. At this point, Doe retrieved the keys to her residence from Deremiah.

The April 2014 event was a precursor for the events that gave rise to this disciplinary proceeding. Deremiah and Doe had been drinking at various Des Moines bars on the night of July 25, 2014. An argument ensued at one of the locations, resulting in Deremiah and Doe going their separate ways. After the altercation, Deremiah went to Doe's home and broke in the front door, causing damage to the door. Doe, however, was not at home. Deremiah then left the Doe residence.

Deremiah later returned to the residence. This time Doe was at home. Deremiah asserts he suffered from an alcohol-related blackout and does not remember what happened next. Similarly, Doe's memory of the event is cloudy. Nonetheless, the record establishes that Deremiah assaulted Doe in her bedroom. He punched Doe in the face multiple times, causing facial swelling and bruising to her eyes. Her left eye soon became swollen shut. According to a police officer who responded to the reported domestic assault, "I thought it was a broken eye socket because it was so swollen." Deremiah also pulled Doe's hair, leaving a clump of hair in the bedroom where the assault occurred. After the assault, Deremiah called his father who picked him up and drove him to his home, where Deremiah was also living at the time.

Doe called 911 in the early morning hours of July 26. After interviewing her and investigating the scene, the police took photographs of Doe's injuries, the clump of hair in the bedroom, and the damage to the door. Police noted that Doe was distraught. After completing their investigation at the scene, police traveled to Deremiah's father's home and, after Deremiah admitted he had been with Doe the previous evening, he was arrested. The district court entered a no-contact order following Deremiah's arrest.

The state charged Deremiah with two crimes. In Count I, the state charged him with domestic abuse assault with intent to inflict a serious injury, an aggravated misdemeanor. Iowa Code §§ 708.1, .2A(2)(*c*) (2013). In Count II, the state charged Deremiah with trespass causing bodily injury and/or property damage, a serious misdemeanor. *Id.* §§ 716.7, .8(2).

Deremiah pled guilty to both charges. On Count I, the court sentenced Deremiah to two years in prison with all but two days suspended and two years of probation with fines and surcharges. On Count II, the court sentenced him to one year in prison, all suspended, to run consecutively with the sentence under Count I.

As result of his probation, Deremiah was required to undergo substance abuse evaluation. The substance abuse evaluation recommended treatment. Deremiah was further required to attend a twenty-four-week program related to domestic assaults. Deremiah complied with these recommendations and requirements of probation. He also engaged a therapist, Winnie Hall, to provide him with private counseling twice a week. As part of his recovery program, Deremiah attends Alcoholics Anonymous (AA) meetings regularly, meets with his sponsor, and has consulted regularly with Hugh Grady of the Iowa Lawyers Assistance Project.

At the time of the hearing, Deremiah had recently received his one-year AA chip commemorating his sobriety. He was also continuing to attend AA meetings on a regular basis and to receive counseling from Hall and Grady on a regular basis.

Deremiah testified that he has come to understand the role of alcohol in his life. Both Hall and Grady testified at the hearing that

Deremiah was actively engaged in recovery and that his prognosis with respect to managing his alcoholism was good.

At the time of the hearing, Deremiah and Doe talked to each other on a daily basis and saw each other weekly. Deremiah testified that he avoids being with Doe when she consumes alcohol.

**B. Proceedings Before the Commission Related to Sanctions**. The parties agreed that Deremiah's conduct violated rule 32:8.4(b). The central contested issue before the commission was the appropriate sanction under the facts and circumstances.

The Board argued for a three-month suspension. It emphasized that in this case, Deremiah committed two serious infractions, one relating to the breaking into Doe's home and the other arising out of the assault. As a result, the Board contended this was not a case of a single-incident domestic assault, but a case involving multiple incidents of wrongful conduct.

The Board also asserted the record showed a lack of remorse on Deremiah's part and some minimizing of his behavior. It further noted that Deremiah had not taken proactive steps to reimburse Doe's landlord for the damage to the door or to reimburse Doe for her medical expenses that arose from her injuries.

Deremiah argued the appropriate sanction was a public reprimand. Among other things, Deremiah asserted a suspension would have a severe impact on his legal practice and on his clients. He noted that he was involved in long-term representations in a number of juvenile matters and that it would be difficult to get another attorney up to speed in these cases, thereby causing damage to clients. Deremiah also submitted financial information to the commission that showed his income was sufficient to meet his expenses with little to spare, that his

very modest assets were exceeded by credit card debt accumulated in his drinking days, and that he was also carrying substantial debt from law school.

The commission fractured on the question of sanction. Three members of the commission recommended a one-month suspension, a probationary period of two years, and various reporting requirements. One member of the commission proposed a ninety-day suspension. Another member of the commission proposed a public reprimand, along with a two-year probationary period and various reporting requirements.

## II. Standard of Review.

We review attorney disciplinary proceedings de novo. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Stowe*, 830 N.W.2d 737, 739 (Iowa 2013). An attorney's ethical misconduct must be proved by a convincing preponderance of the evidence. *Id.* "We respectfully consider the commission's findings and recommendations, but are not bound by them." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Englemann*, 840 N.W.2d 156, 158 (Iowa 2013). "If we find a violation, we 'may impose a lesser or greater sanction than the discipline recommended by the grievance commission.' " *Id.* (quoting Iowa Ct. R. 35.11(1)).

## III. Discussion.

**A. Violation of Iowa Code of Professional Conduct 32:8.4(b).** The parties do not dispute that Deremiah violated Iowa Rule of Professional Conduct 32:8.4(b). While the parties agreed to the violation, we nonetheless exercise independent judgment to ensure that the record and the law support the conclusion of the commission that ethical violations occurred. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Wright*, 857 N.W.2d 510, 514 (Iowa 2014).

We begin with a discussion of general principles. We have long held that domestic assault cases may give rise to professional discipline. For instance, in *Committee on Professional Ethics & Conduct v. Patterson,* we suspended a lawyer's license for three months as a result of a domestic assault lasting two hours that occurred in front of a child and caused bodily injury. 369 N.W.2d 798, 799, 801 (Iowa 1985). We also cited domestic assaults as subject to sanction in other cases involving a number of additional violations of our ethical rules. *See, e.g., Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Ruth,* 636 N.W.2d 86, 87 (Iowa 2001) (concerning an OWI and domestic assault); *Comm. on Prof'l Ethics & Conduct v. Lapointe,* 415 N.W.2d 617, 618–19 (Iowa 1987) (involving domestic assault and tampering with a witness).

These cases, however, arose under ethical rules somewhat different than our present regime. Our findings related to ethical violations arising out of domestic assaults rested on "moral turpitude" under the Iowa Code of Professional Responsibility. *See, e.g., Ruth,* 636 N.W.2d at 88; *Lapointe,* 415 N.W.2d at 619; *Patterson,* 369 N.W.2d at 800–01. In 2005, we adopted an Iowa version of the Model Rules of Professional Responsibility. The model rules removed ethical provisions related to moral turpitude from the lawyer's ethics regime. The deletion of moral turpitude was based on fear that the open-ended provision could draw within its scope activities that did not have any impact on the ability of a person to practice law and did not adversely reflect on the law or the courts in any substantial way. *See* Ellen J. Bennett, et al., *Annotated Model Rules of Professional Conduct,* R. 8.4 cmt. 2 (8th ed. 2015) (explaining how the concept of moral turpitude could be construed to contain matters of personal morality that have no specific connection to fitness to practice law).

But while we deleted provisions related to moral turpitude, our rules defined professional misconduct broadly enough to include offenses not directly involved in the practice of law. *See* 2 Geoffrey C. Hazard, Jr., et al., *The Law of Lawyering*, § 69.04, at 69-11 (4th ed. 2015 Supp.) [hereinafter *The Law of Lawyering*] (referring to moral turpitude as "notoriously ambiguous"). Instead, the new rules provide that "[i]t is professional misconduct for a lawyer to . . . commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects." Iowa R. Prof'l Conduct 32:8.4(b).

This rule is both broader and narrower than prior disciplinary rules. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Keele*, 795 N.W.2d 507, 512 (Iowa 2011) (citing a prior edition of *The Law of Lawyering*, now at 69-12). Under rule 32:8.4(b), not all crimes subject a lawyer to professional discipline. Only those crimes with a nexus to the practice of law subject a lawyer to professional discipline. *Keele*, 795 N.W.2d at 512.

We considered the application of rule 32:8.4(b) in what has been referred to as a landmark case in *Iowa Supreme Court Attorney Disciplinary Board v. Templeton*, 784 N.W.2d 761 (Iowa 2010). *See* Gregory C. Sisk & Mark S. Cady, 16 *Iowa Practice Series*, *Lawyer and Judicial Ethics*, § 12:4(c), at 10.55 (2015). In *Templeton*, the respondent engaged in repeated incidents of window peeping. 784 N.W.2d at 765. Templeton was ultimately convicted of six counts of invasion of privacy. *Id.* at 765–66. We concluded that Templeton engaged in a pattern of criminal conduct that "raise[d] serious misgivings about whether Templeton underst[ood] the concept of privacy and respect[ed] the law protecting individuals' privacy rights." *Id.* at 767–68. As a result, we found a violation of rule 32:8.4(b). *Id.* at 768.

In reaching our result in *Templeton*, we discussed at length, and ultimately adopted, an approach to rule 32:8.4(b) similar to that adopted under a comparable disciplinary rule by the Oregon Supreme Court in *In re White*, 815 P.2d 1257 (Or. 1991). In *White*, the Oregon Supreme Court observed that not every criminal act reflects adversely on the lawyer's fitness to practice law. *Id.* at 1265. In particular, the court noted that a simple misdemeanor assault arising from a private dispute would not, in and of itself, be sufficient to establish a violation. *Id.* In analyzing criminal misconduct, the Oregon Supreme Court stated that each case must be judged upon its own facts in determining whether a violation of disciplinary rules occurred. *Id.* Factors to be considered included

> the lawyer's mental state; the extent to which the act demonstrates disrespect for the law or law enforcement; the presence or absence of a victim; the extent of actual or potential injury to a victim; and the presence or absence of a pattern of criminal conduct.

*Id.*

We embraced the approach of *White* in *Templeton*. *Templeton*, 784 N.W.2d at 767. Although the substantive language changed with our adoption of the model rules, our approach in *Templeton* was consistent with the methodology under our previous ethics regime in which we emphasized the need to avoid per se rules or mechanical application of labels in determining the existence of ethical violations. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Weaver*, 750 N.W.2d 71, 79 (Iowa 2008); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Marcucci*, 543 N.W.2d 879, 883 (Iowa 1996). We now consistently use the *Templeton* factors to determine whether a lawyer's criminal misconduct amounts to an ethical violation under rule 32:8.4(b). *See, e.g., Iowa Supreme Ct. Att'y Disciplinary Bd. v. Blessum*, 861 N.W.2d 575, 588–89 (Iowa 2015); *Iowa*

*Supreme Ct. Att'y Disciplinary Bd. v. Rousch,* 827 N.W.2d 711, 716 (Iowa 2013); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Cannon,* 821 N.W.2d 873, 877–78 (Iowa 2012); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Weaver,* 812 N.W.2d 4, 11 (2012).

After the adoption of the model rules and our gloss in *Templeton*, we considered the rule in the context of domestic assault in *Iowa Supreme Court Attorney Disciplinary Board v. Schmidt,* 796 N.W.2d 33 (Iowa 2011). In *Schmidt,* an attorney who had never before been violent toward his wife assaulted her, chased her around the house, choked her to the point of unconsciousness, and pursued her into a neighbor's garage in the presence of the couple's children. *Id.* at 37–38. Schmidt further attempted to prevent her and a neighbor from calling 911. *Id.* at 37, 41. When arriving officers placed him in a police car, he damaged the steel cage in the interior of the vehicle. *Id.* at 38. Schmidt's spouse was taken to the emergency room at a local hospital in moderate distress with abrasions to her neck, a three-centimeter laceration, abrasions on her neck and knees, and pain and stiffness of the neck. *Id.*

We concluded that Schmidt's behavior violated rule 32:8.4(b). *Id.* at 41. In doing so, we applied the *Templeton* factors. *Id.* at 40–41. While we stated that not all acts of violence will lead to professional discipline, we noted that the acts of violence by Schmidt were more than trivial. *Id.* at 41. We cited Schmidt's conscious decision to act on his hostility to his wife and assault her multiple times instead of walking away from the situation. *Id.* We further noted that Schmidt attempted to prevent his wife from calling 911 and lied to a neighbor to prevent him from calling 911. *Id.* We stated that while Schmidt suffered from depression, this did not excuse the choices he made, particularly in light of the lack of medical support that his mental condition clouded his judgment. *Id.*

Finally, we noted that the lack of a pattern of misconduct did not prevent his violent acts from amounting to a violation of rule 32:8.4(b). *Id.*

We now turn to apply the *Templeton* factors to determine whether there has been a violation of rule 32:8.4(b) in this case. On the issue of mental state of mind, Deremiah suggests that he does not remember the assault because of an alcohol-related blackout. In several cases, we rejected such claims, noting that they were not supported by adequate medical testimony. *See Rousch*, 827 N.W.2d at 717 (finding that respondent presented no evidence that depression or alcohol clouded his judgment); *Cannon*, 821 N.W.2d at 878 (explaining that depression and substance abuse are not excuses, especially with no medical evidence of their effect on respondent's mental state); *Schmidt*, 796 N.W.2d at 41 (stating depression and alcohol did not excuse mistakes, and no medical evidence as to how depression affected his mind and decision-making was submitted); *Patterson*, 369 N.W.2d at 801 (noting beyond his own contentions, no professional opinion offered to support respondent's claim that he lost his reason and had no recollection of the event).

Here, Deremiah presented the testimony of Winnie Hall, a licensed mental health therapist and a certified substance abuse counselor. She stated that "he was in a blackout" when the event occurred. It is not entirely clear from the transcript whether Hall was stating an opinion or simply reporting what Deremiah had told her. Hall further testified that when an alcoholic is in a blackout state, the alcoholic can fully function but does not remember what happened.

Deremiah has presented more evidence concerning alcoholic blackouts than was presented in *Patterson*, *Cannon*, *Rousch*, and *Schmidt*. Yet, Hall testified that an alcoholic in a blackout state could still distinguish between right and wrong. Further, while we have

generally found that the use of drugs or mental illness may be relevant for mitigation of sanctions, they do not provide an excuse for ethical violations. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Dolezal*, 841 N.W.2d 114, 129 (Iowa 2013) (stating depression and posttraumatic stress disorder were mitigating factors, but did not excuse misconduct); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Clarity*, 838 N.W.2d 648, 661 (Iowa 2013) (holding alcoholism may be considered in mitigation where alcohol contributed to misconduct and lawyer undertakes rehabilitative efforts to control addiction); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Van Beek*, 757 N.W.2d 639, 644 (Iowa 2008) (finding depression and alcoholism to be mitigating factors); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Grotewold*, 642 N.W.2d 288, 295 (Iowa 2002) (noting depression does not excuse unethical conduct but is a mitigating circumstance). Our view is consistent with the vast majority of cases in other jurisdictions. *See In re Harrington*, 293 P.3d 686, 694 (Kan. 2013) (per curiam) (including addiction to alcohol as a mitigating factor when supported by medical evidence); *In re Arata*, 150 So. 3d 302, 306 (La. 2014) (recognizing that chemical dependence, along with meaningful efforts to address this dependence, serves as mitigation); *In re Karlsen*, 778 N.W.2d 307, 313 (Minn. 2010) (describing depression and medical issues as mitigating factors when established by clear and convincing evidence); *In re Charron*, 918 S.W.2d 257, 261 (Mo. 1996) (explaining that depression could serve to mitigate punishment, but not excuse guilt). We adhere to these cases today.

The second *Templeton* factor is disrespect of the law or law enforcement. The use of violence to settle disputes is the antithesis of the rule of law. Lawyers who use violence undermine the legal system which requires respect, restraint, and resort to the legal process. *See In*

*re Walker*, 597 N.E.2d 1271, 1272 (Ind. 1992) (observing that attorneys who commit violent acts can cause the public to rightfully question "whether the system itself is worthy of respect"); *In re Grella*, 777 N.E.2d 167, 171 (Mass. 2002) (describing the essential role of a lawyer as facilitating resolutions of conflict without violence); *In re Magid*, 655 A.2d 916, 919 (N.J. 1995) (stating that society condemns acts of violence and that domestic violence always involves victims); *In re Rosenblatt*, 687 N.Y.S.2d 23, 25 (App. Div. 1999) (admonishing that an attorney is expected to use legal means to solve his problems, not violence).

Further, the trespass issue here is problematic. Like the trespasses in *Templeton*, breaking through a locked door of a home does not show respect for the sanctity of the home and the privacy interests associated with it. Such an invasive violent act shows disrespect for the law, which consistently recognizes the special value of the home as a place of safety and refuge. *See* Iowa Code § 561.16 (providing for an unlimited exemption of one's homestead from judicial sale); *People v. Jones*, 821 N.E.2d 955, 957 (N.Y. 2004) (discussing the exception to the self-defense duty to retreat when the defender is at home and noting "peoples' homes are their castles, and that as such one's home is a place of sanctuary"); Margaret Jane Radin, *Property and Personhood*, 34 Stan. L. Rev. 957, 987 (1982) (describing how one tends to identify one's "home" as an attribute of oneself and not a mere possession); Stephanie M. Stern, *Residential Protectionism and the Legal Mythology of Home*, 107 Mich. L. Rev. 1093, 1100–05 (2009).

The third *Templeton* factor is the existence of a victim and the degree of injury resulting from the lawyer's misconduct. Here, Deremiah engaged in an escalating course of conduct that included destruction of Doe's private property, trespass of her home with intent to commit a

serious injury, and an ongoing assault that resulted in significant bruising and swelling of both eyes, swelling in her face, hair being ripped out, and obvious resulting psychological harm. This was not a case involving slight or no injury. There clearly was a victim with palpable injuries.

Fourth, on the question of a pattern of conduct, we note that Deremiah makes the argument that the domestic assault occurring in July was a singular event. In *Keele*, for instance, we found that the federal firearms violation was an isolated event that did not give rise to a violation. *Keele*, 795 N.W.2d at 514. Our cases have often emphasized the pattern of misconduct. *See, e.g., Iowa Supreme Ct. Att'y Disciplinary Bd. v. Cross*, 861 N.W.2d 211, 226–27 (Iowa 2015); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Boles*, 808 N.W.2d 431, 442 (Iowa 2012); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Parrish*, 801 N.W.2d 580, 589 (Iowa 2011).

The facts of this case do not show a persistent pattern of repeated misconduct. Yet, there was the event in April, which involved Deremiah burning Doe's DVDs and a resulting call to the police. This occurrence seems to have been a precursor to events in July. We have in our cases noted that two occasions of misconduct are cause for concern. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Khowassah*, 837 N.W.2d 649, 654 (Iowa 2013); *Rousch*, 827 N.W.2d at 718. In any event, when violent acts resulting in significant injury occur, a pattern of conduct is not required to establish a violation of our disciplinary rules. *See Schmidt*, 796 N.W.2d at 41. When it comes to the application of rule 32:8.4(b) to violent assaults on intimate partners, one assault is one too many.

Finally, in addition to the specific *Templeton* factors, we consider whether the domestic assault and trespass in this case has a bearing on

Deremiah's legal practice. In *Schmidt,* we stated that "domestic-abuse conduct did not affect [the attorney's] behavior toward his clients, fellow lawyers, or judges." *Schmidt,* 796 N.W.2d at 44. We made a similar statement in *Iowa Supreme Court Attorney Disciplinary Board v. Axt,* 791 N.W.2d 98, 102 (Iowa 2010).

These observations in *Schmidt* and *Axt* were used only in the sense that the specific acts of misconduct in question had no direct impact on a particular identifiable case or client. Yet, our other cases recognize that a lawyer's misconduct can have an indirect impact on the lawyer's ability to practice law. For example, in *Rousch,* the attorney's illegal drug usage did not have a direct impact on a particular case or client. 827 N.W.2d at 718. We noted, however, that a criminal attorney's illegal drug use could lead to difficult situations in his law practice when he represented drug offenders. *Id.* We noted that *Rousch* was violating the category of laws that he regularly encountered in his work. *Id.*

Here, Deremiah's practice included family and criminal law. A competent family lawyer must be able to recognize and effectively deal with situations involving domestic abuse. *See In re Walker,* 597 N.E.2d at 1272; *Magid,* 655 A.2d at 919 (stating an attorney's commission of domestic violence calls into question the zealousness of his advocacy when representing victims of such crimes or prosecuting perpetrators). For example, the American Bar Association has developed screening tools to assist lawyers in identifying domestic abuse and materials for comprehensive representation and advocacy of domestic abuse clients. *See* Comm'n on Domestic Violence, Am. Bar Ass'n *Tool for Attorneys to Screen for Domestic Violence* (2005), http://www.american bar.org/content/dam/aba/migrated/domviol/screeningtoolcdv.authchec kdam.pdf; Comm'n on Domestic Violence, Am. Bar Ass'n *Comprehensive*

*Issue Spotting: A Tool for Civil Attorneys Representing Victims of Domestic & Dating Violence, Sexual Assault & Stalking*, (2008), http://www.americanbar.org/content/dam/aba/migrated/domviol/pdfs/Issue_Spotting_FINAL.authcheckdam.pdf. A lawyer engaged in the practice of family law who engages in acts of domestic abuse may be less effective in screening and addressing similar incidents of abuse experienced by clients. A family lawyer must protect clients from acts of family violence, not commit them. *Cf. Magid,* 655 A.2d at 919.

We conclude that consideration of the *Templeton* factors establish a violation of rule 32:8.4(b). In particular, the criminal trespass and violent injurious assault are salient facts showing a disrespect for the law as contemplated in the second *Templeton* factor.

**B. Sanctions.** We now turn to the question of sanctions. In considering sanctions, we must focus on their purpose. We do not seek in our sanctions to inflict punishment for criminal conduct in any general sense. That is the function of the criminal law. The range of penalties for criminal activities are established by the legislature and are enforced through criminal prosecutions. Imposing greater punishment for domestic assault crimes is a matter for the legislature and public prosecutors who exercise their discretion in enforcing the law.

That said, in addition to providing a mechanism to police poor lawyering, the rules authorize us to protect the public and maintain public confidence in the legal profession through the disciplinary process. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Iversen*, 723 N.W.2d 806, 810 (Iowa 2006). We further seek to impose discipline to deter individual attorneys from reoffending. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Qualley*, 828 N.W.2d 282, 293 (Iowa 2013). We also seek to deter the misconduct of others. *Templeton,* 784 N.W.2d at 771;

*Thompson*, 595 N.W.2d at 134. In calibrating our sanctions, we focus on these issues and not generalized criminal punishment.

In determining sanctions, we have generally rejected per se rules and have instead considered the totality of facts and circumstances of an individual case. Nonetheless, we have sometimes referred to general ranges of sanctions that arise from certain types of misconduct. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Said*, 869 N.W.2d 185, 193 (Iowa 2015) ("When determining what sanctions to impose, we consider those imposed in similar cases while remaining aware of the different circumstances in each case."). In *Axt*, we suggested that the sanctions imposed against lawyers committing domestic abuse "ranged from a suspension of two months to a suspension of two years depending on the nature and extent of other misconduct proved by the board in the same case." 791 N.W.2d at 102.

In *Schmidt*, we suggested that in cases involving domestic assaults with injuries to the victims we generally would consider a suspension of up to six months before consideration of aggravating and mitigating factors. 796 N.W.2d at 45. In that case, we determined that the singular nature of the offense plus especially robust efforts to address alcohol and mental health problems were sufficient to lessen the suspension to a one-month period. *Id.*

The aggravating facts arise here primarily from the violation itself. The victim of domestic assault suffered notable physical injuries and psychological harm from an assault in her own bedroom. We do not find the domestic nature of the assault a mitigating factor; indeed it is an aggravating factor. Violence by an intimate partner is a raw assault on the basic individual right to physical security that lies at the core of civilized society.

We also note the escalating violence in this case. Although not well-developed in the record, it is clear that in April, Deremiah engaged in conduct cumulating in the destruction of Doe's property and resulting in a 911 call by Doe to stabilize the situation. This, of course, is a lesser event compared to what occurred in July, but it should have been a clear harbinger to Deremiah. The significance of the event was not lost on Doe, who retrieved the key to her home from Deremiah after this incident. Yet, on July 26, Deremiah engaged in an act of trespass by breaking into Doe's home and, ultimately, proceeded to repeatedly punch Doe in the face and pull out her hair in the confines of her bedroom in the early morning hours.

Finally, there is an issue regarding restitution. Deremiah damaged the door to Doe's residence when committing the trespass offense. It is true that the damage was relatively minor and that a court order detailing required restitution was not entered. Yet, Deremiah must have known of the damage, and yet he appears to have taken no proactive steps to assume responsibility for it. This is, perhaps, an error of negligent omission more than anything else, but it does not foster confidence that Deremiah has forthrightly assumed full responsibility for his actions.

As in *Schmidt*, there are mitigating factors. Deremiah has not had prior discipline, which we have recognized as a mitigating factor. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Bartley*, 860 N.W.2d 331, 339 (Iowa 2015). Notwithstanding the restitution issue, he has accepted responsibility for his acts and seems genuinely remorseful, a mitigating factor. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kingery*, 871 N.W.2d 109, 122 (Iowa 2015). In addition, Deremiah has engaged in robust

efforts to deal with his substance abuse. We regard the effort to obtain help as a mitigating factor. *Id.* at 122; *Schmidt*, 796 N.W.2d at 39, 45.

We think the various opinions of the members of the commission reflect the range of possible sanctions in this case. We cannot, however, accept a public reprimand as an adequate sanction. Here, the escalating tumultuous relationship between Deremiah and Doe led to an assault resulting in substantial injuries. Notwithstanding the mitigating factors, we think a mere reprimand is not adequate under the circumstances.

We give respectful consideration to the majority's recommendation of a thirty-day suspension, but we note that the majority also suggests a two-year period of probation. The majority thus proposed a sanction that offers protection well beyond the period of suspension. We have not imposed probation beyond the period of suspension in our prior cases on the ground that we lack the administrative machinery to provide effective supervision. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Johnson*, 792 N.W.2d 674, 683 (Iowa 2010); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Lickiss*, 786 N.W.2d 860, 871–72 (Iowa 2010); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kirlin*, 741 N.W.2d 813, 819 (Iowa 2007).

We could impose a thirty-day suspension as in *Schmidt*. The nature of the assaults are somewhat similar. The physical harm in this case bears a resemblance to those in *Schmidt*. As in *Schmidt*, Deremiah's acts included some damage to property.

There are also differences. There is no evidence that Deremiah interfered with efforts to summon help as in *Schmidt*. *See Schmidt*, 794 N.W.2d at 41. And, although the assault in *Schmidt* occurred in front of children (which produced trauma so great that they did not want to see their father during subsequent visitations), *id.* at 38, the assault in this case did not involve injury to children who witnessed the abuse. *Schmidt*

also involved a violation of an ethical rule unrelated to domestic abuse in the case, *id.* at 39–40; there was no similar unrelated infraction in Deremiah's case. Yet, Deremiah was found guilty of two criminal infractions—one involving trespass and the other involving assault.

From time to time we step back and consider whether our approach to sanctions in our cases is generally sufficient to advance the purposes of our ethics rules. For example, we increased the sanctions for failure to file income tax returns in order to protect the reputation of the bar. *Comm. on Prof'l Ethics & Conduct v. Jones*, 368 N.W.2d 157, 157 (Iowa 1985) ("[W]e are determined to continue to impose sanctions and, if necessary to end tax violations by members of the profession, to increase the periods of suspension."). Similarly, in *Schmidt*, we took a step in ratcheting up the floor of sanctions for domestic assault by declaring that while an admonition for domestic abuse might have been appropriate in the past, we no longer considered an admonition a sufficient sanction for domestic abuse resulting in serious injury. 796 N.W.2d at 43.

After reviewing our cases and considering the issues raised in this matter, we take another step in strengthening our disciplinary approach to injurious domestic assaults by imposing a sanction in excess of the one-month suspension imposed in *Schmidt*. We impose the increased sanction in part because of the destruction of property and trespass of the home, which occurred prior to the assault, but also to reemphasize what was said in *Schmidt*, namely, that domestic abuse by lawyers is out-of-bounds conduct that will not be tolerated by this court. *Id.* at 44. In escalating the sanctions for domestic abuse, we seek to preserve the reputation of the bar, ensure that family law lawyers are fit to offer holistic legal advice, and deter other lawyers from committing similar violations. We conclude that the proper sanction in this case is a

suspension of Deremiah's license to practice law indefinitely with no possibility of reinstatement for at least three months.

In addition, Deremiah should continue to address the issues of his substance abuse and mental health. The record demonstrates that Deremiah has made a good start in this regard. Before reinstating Deremiah's license, however, we require that Deremiah present to us evidence that he is continuing in his recovery efforts and that he is mentally fit to practice law.

As a result, at the time of any application for reinstatement, we require Deremiah to provide the court with (1) a mental health evaluation by a physician who has signed an affidavit indicating that he is fit to resume the practice of law, and (2) a substance abuse evaluation indicating he is fit to practice law. *See Rousch*, 827 N.W.2d at 721. We also require that any application for reinstatement be set for hearing before us before the suspension in this case is lifted. Iowa Ct. R. 34.25(2).

**IV. Conclusion.**

For the above reasons, we suspend Deremiah's license to practice law indefinitely with no possibility of reinstatement for three months. This suspension applies to all facets of the practice of law. *See* Iowa Ct. R. 34.23(3). Deremiah must comply with Iowa Court Rule 34.24 dealing with the notification of clients and counsel. Costs for this action are taxed to Deremiah pursuant to Iowa Court Rule 36.24. Upon application for reinstatement, Deremiah must demonstrate that he has not practiced law during the period of his suspension and that he has complied with all of the requirements for reinstatement provided in Iowa Court Rule 34.25. In any application for reinstatement, Deremiah must present an

affidavit from a mental health professional and a substance abuse evaluation demonstrating Deremiah's fitness to practice law.

**LICENSE SUSPENDED.**